TIMOTHY COURCHAINE
United States Attorney
District of Arizona

KATHERINE R. BRANCH
Assistant U.S. Attorney
Arizona State Bar No. 025128
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4449
Telephone:  602-514-7500
Facsimile:  602-514-7760
Email: Katherine.Branch@usdoj.gov
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | No. |
|---|---|
| Plaintiff, | |
| v. | **COMPLAINT FOR INJUNCTIVE RELIEF** |
| Mehrad Asadieidivand, | |
| Defendant. | |

Plaintiff United States of America asks this Court to issue an Order permitting the Department of Homeland Security ("DHS"), through its component agencies, Immigration and Customs Enforcement ("ICE") and the Public Health Service, Division of Immigration Health Services Corps ("IHSC") to monitor Defendant Mehrad Asadieidivand's medical condition and to administer intravenous fluids and medications without Mr. Asadieidivand's consent.

### PARTIES

1.      Plaintiff is the United States of America.

2.      Defendant is Mehrad Asadieidivand, a native and citizen of the country of Iran.

**JURISDICTION AND VENUE**

3.    This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1345 (United States as plaintiff), 8 U.S.C. § 1329 (suits by the United States under the Immigration and Nationality Act ("INA")), and 28 U.S.C. § 1651 (the All Writs Act). Pursuant to Fed. R. Civ. P. 65(a), this Court has jurisdiction to issue temporary restraining orders and injunctions.

4.    Courts have recognized that the United States has authority to prevent suicides by detainees and prisoners. *See Aamer v. Obama*, Nos. 13–5223, 13–5276, 13–5224, 13–5225, 2014 WL 519238 (D.C. Cir. Feb. 11, 2014) (acknowledging that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death); *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001) (noting that the Government's interests in the preservation of life and other factors have provided a basis for ordering forced feeding of an immigration detainee); *In re Sanchez*, 577 F. Supp. 7 (S.D.N.Y. 1983) (the Government was permitted to force-feed civil contemnor who had gone on hunger strike and was in immediate danger of suffering permanent bodily damage as a result); *United States v. Onyango*, No. 14-cv-0401-JAH-NLS, Docket No. 8 (S.D. Cal. Feb. 25, 2014) (granting temporary restraining order directing feeding, hydration, and medical testing as necessary to prevent injury, organ failure, or loss of life); *United States Department of Homeland Security v. Yaldiz*, No. 19-cv-1752-GPC-WVG, Docket No. 6 (S.D. Cal. Sept. 12, 2019) (granting temporary restraining order to allow involuntary hydration, medical examinations, and restraint if necessary); *United States Department of Homeland Security v. Ivanov*, No. 19-cv-1573-DMS-MDD, Docket No. 6 (S.D. Cal. Aug. 22, 2019) (granting temporary restraining order to allow physical evaluations, involuntary feeding and hydration, and restraint if necessary).

5.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District, at the Florence Detention Center ("FDC") in Florence, Arizona.

**FACTS**

6. Mr. Asadieidivand has been detained by ICE since May 31, 2025.

7. Mr. Asadieidivand entered the FDC on May 31, 2025.

8. Mr. Asadieidivand's last meal was on June 6, 2025.

9. On June 8, 2025, after nine (9) missed meals, Mr. Asadieidivand was classified as a hunger striker.

10. As of June 10, 2025, Mr. Asadieidivand is on day five (5) of his hunger strike and has refused sixteen (16) meals as of breakfast.

11. Since June 8, 2025, Mr. Asadieidivand has consumed minimal water, but no nutritional supplements (e.g. Boost), and has refused to consume any solid food.

12. Mr. Asadieidivand's stated reason for his hunger strike is to have his immigration case heard by an Immigration Judge or to be released by ICE.

13. On June 8, 2025, Mr. Asadieidivand was transported to a local hospital's emergency department due to dizziness and generalized weakness. Laboratory tests performed at the hospital indicated acute kidney injury. Mr. Asadieidivand refused all hydration and treatment and was transported back to FDC.

14. Until June 9, 2025, Mr. Asadieidivand was allowing medical staff at FDC to obtain his vital signs, including blood pressure and heart rate. However, as of June 10, 2025, Mr. Asadieidivand is refusing to allow medical staff to perform vital sign assessments, physical examinations, or obtain his weight. He is also refusing to stand, and continues to decline orthostatic blood pressure measurements, full physical assessments, EKG, laboratory testing, and any further hospital transfer.

15. Mr. Asadieidivand is showing signs of rapid decompensation. He is slow to respond, exhibits pallor upon sitting, and reports palpitations, dizziness, and nausea. He demonstrates decreased strength, an unsteady gait, and has ceased producing urine. He is under continuous medical observation at FDC.

16. IHSC medical personnel have explained the importance of lab monitoring to assess the health of Mr. Asadieidivand's internal organs, but he continues to refuse to

provide blood or urine for laboratory analysis.

17. IHSC medical personnel have explained the risks of continuing the hunger strike to Mr. Asadieidivand, including the likely medical ramifications of his continued hunger strike, how starvation and dehydration effect the kidneys, heart, and other internal organs, and can cause cardiac arrest.

18. Despite having been advised on the risks of continuing his hunger strike, Mr. Asadieidivand continues to decline both oral and intravenous hydration, nutritional supplements, food, and medical examinations.

19. At this time, there are no known medical or psychiatric conditions that would cause Mr. Asadieidivand not to eat or drink.

20. A weight loss of 18% below initial weight can result in serious medical problems, such as liver, kidney, and brain failure. The medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

21. Although Mr. Asadieidivand's current weight loss is only 6.86% of his baseline body weight, he is decompensating rapidly and is demonstrating worsening neurological symptoms.

22. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted.

23. Mr. Asadieidivand's current clinical condition and medical status are unknown due to his refusal to consent to physical examination, and collection of blood and urine for laboratory analysis.

24. In the opinion of the IHSC physician who has been overseeing Mr. Asadieidivand's medical care, Mr. Asadieidivand is at the point where he requires immediate medical intervention to prevent further deterioration of his health and to prevent serious medical complications. This intervention includes performing physical evaluations to monitor and assess Mr. Asadieidivand's clinical condition, measuring vital signs, performing necessary laboratory tests. If the results of those evaluations indicate additional

medical concerns, it may be necessary to administer involuntary intravenous fluids and medication, and ultimately, to administer involuntary nutrition.

25.    It is difficult to predict how long the human body can survive without food, and if an individual does not have adequate fat stored, this time decreases significantly.

26.    Continued fasting will result in permanent damage to internal organs and has the potential to become life threatening. Specifically, Mr. Asadieidivand is at risk of experiencing metabolic acidosis and life-threatening dehydration, which can lead to organ damage and decreases access to peripheral veins, which would be critical should he reverse his hunger strike since this is how fluids would be rapidly provided to him. At that point, intravenous infusion of liquids, including electrolytes, multivitamins, glucose, and potassium, will be immediately necessary.

27.    Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

28.    Due to the inability to assess Mr. Asadieidivand's exact medical state, there is concern that he may rapidly develop kidney failure, liver failure, heart failure, and/or die. If Mr. Asadieidivand continues his hunger strike, his deterioration will reach the point where immediate medical intervention will be necessary to prevent permanent injury or death.

29.    Medical monitoring through vital signs, laboratory tests, weight checks, and physical examinations is critical to assess whether medical intervention has become necessary to preserve Mr. Asadieidivand's life and long-term health.

30.    For a patient on a hunger strike, the following evaluations are necessary: laboratory test at least every 48–72 hours; physical examination daily; urinalysis; daily weight checks; and frequent taking of vital signs.

31.    If laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer medications intravenously to address those conditions.

32.    Should Mr. Asadieidivand refuse to cooperate with blood work and other necessary medical monitoring and testing, soft restraints may be required to immobilize

5

him and prevent unnecessary injury to both Mr. Asadieidivand and the medical staff.

33. The decline in Mr. Asadieidivand's health and well-being, brought on by his refusal to eat or to consent to medical monitoring of his condition, poses a serious threat to the security and good order of the FDC.

34. Mr. Asadieidivand has been repeatedly counseled on the dangers of self-imposed dehydration and the effects of starvation on his body.

35. Mr. Asadieidivand was also counseled about involuntary hydration and feeding procedures to prevent injury and/or death should he continue to refuse food.

36. Without medical monitoring of Mr. Asadieidivand's vital signs and physical condition, and laboratory testing of his blood and urine, the medical staff at the FDC have no way to accurately assess Mr. Asadieidivand's clinical condition.

37. Based on Mr. Asadieidivand's current physical condition and the inability to monitor his medical status and condition, it is the opinion of the medical providers at FDC that that involuntary medical and laboratory monitoring are necessary. Based upon the results of such monitoring, administration of intravenous fluid and medications may also be necessary, as might administration of nutrition through a nasogastric tube.

## CAUSE OF ACTION

38. The Secretary of the U.S. Department of Homeland Security, through ICE, is authorized to provide medical treatment to aliens who require treatment during removal proceedings. 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a).

39. There are legitimate government interests in preserving the life of an immigration detainee, maintaining security and orderly operations in immigration detention facilities, and avoiding burdensome and unnecessary litigation.

40. There is a valid and rational connection between these government interests and the above-described involuntary medical examinations, restraints, and administration of hydration to Mr. Asadieidivand. *See In re Nabil Ahmed Soliman*, 134 F. Supp. 2d 1238, 1253 (N.D. Ala. 2001); *In re Abdel Fattah*, No. 3:08-MC-164, 2008 WL 2704541 (M.D. Pa. July 8, 2008).

41.    To the extent Mr. Asadieidivand is exercising his constitutional rights, he has alternative means to exercise those rights.

**PRAYER FOR RELIEF**

WHEREFORE, the United States requests:

a.    That the Court issue an Order directing the United States, through competent medical providers employed by or contracted with the Public Health Service, ICE Health Service Corps, or at private medical facilities to: (1) perform involuntary medical monitoring of Mr. Asadieidivand, to include physical examination, obtaining weight and vital signs, and collecting blood and urine samples upon which laboratory tests can be conducted, and perform laboratory testing; (2) involuntarily hydrate, medicate, and/or provide nutrition to Mr. Asadieidivand; and (3) restrain Mr. Asadieidivand, if necessary, to accomplish these procedures.

b.    That the Court set this matter for hearing as soon as practicable so it can determine Mr. Asadieidivand's rights; and,

c.    For such other relief as the Court deems appropriate.

Respectfully submitted this 10th day of June, 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/Katherine R. Branch*
KATHERINE R. BRANCH
Assistant United States Attorney

7