# INDEX OF EXHIBITS

## *United States of America v. Mehrad Asadieidivand*
No. 2:25-cv-02011-SPL--DMF

| Exhibit | Description |
|---------|-------------|
| 1 | Declaration of Assistant Field Office Director Cesar A. Topete |
| 2 | Declaration of Carlos Quinones, M.D. |

# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

United States of America

Plaintiff,

v.

Mehrad Asadieidivand

Defendant

**DECLARATION OF CESAR A. TOPETE, ASSISTANT FIELD OFFICE DIRECTOR, FLORENCE DETENTION CENTER**

I, Cesar A. Topete, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1.     I am currently employed as an Assistant Filed Office Director (AFOD) with U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO).  I am assigned to the Florence Detention Center (FDC), located in Florence, Arizona.  At the FDC, I manage ERO personnel and provide oversight of ICE operations in the facility.  I have been employed by DHS since 2003 and under DOJ/INS since 2001, prior to that.  I served as a Supervisory Detention and Deportation Officer atht eh Phoenix Field Office from 2016 to 2024, when I began serving as the Assistant Field Office Director. I officially began my duties as the AFOD on June 16, 2024.

2.     As an AFOD, I am responsible for the supervision and oversight of ERO operations, including detention and removal of noncitizens, at the FDC.

3.     ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment

1

while in custody.  The health, safety, and welfare of all persons detained in its custody are among the agency's highest priorities, and ICE has protocols in place to ensure that any individual on a hunger strike within its detention facilities is promptly and appropriately addressed and treated, and that the safety, security, and order of the facility is maintained for the detainees, staff, contractors, volunteers, and visitors therein.

4.    The Defendant, Mehrad Asadieidivand, A#XXX-XXX-606, (hereinafter Asadieidivand) is a citizen and national of Iran and is presently detained at the FDC under the immigration laws.  He has been detained at the FDC since May 31, 2025.

5.    As of June 8, 2025, Asadieidivand had missed nine consecutive meals and was officially listed as being on a hunger strike by ICE Health Services Corps (IHSC) medical personnel.  As of June 10, 2025, he is on day five of his hunger strike and has missed sixteen meals as of breakfast. Asadieidivand stated his intent in engaging in a hunger strike is either have his case heard by the Immigration Judge or be released by ERO.

6.    Since Asadieidivand began his hunger strike, ERO and IHSC staff have attempted to convince him to end the hunger strike and begin eating food and consuming adequate water.  It has been explained to Asadieidivand that, if he continues the hunger strike, his health will be seriously jeopardized, and he may eventually die.  Despite repeated efforts to convince him to eat and drink adequate fluids, Asadieidivand has failed to cooperate and expressed his commitment to continue the hunger strike.

7.    At the FDC, the personnel have informed Asadieidivand that if he continues his hunger strike it may become necessary to seek a court order to involuntarily examine him, test him, and administer food or hydration to save his life.

8.      In addition to ICE's paramount concerns about the health and wellbeing of ICE detainees, the death or injury of any detainee as a result of a hunger strike would also seriously affect the operations of ICE at the FDC and adversely affect ICE efforts to maintain the safety, security and good order of the detention facility for the detainees, staff, contractors, volunteers, and visitors therein in the following ways:

a.  My foremost obligation is to maintain the safety and security of the ICE detainees housed at the facility and provide for the health and well-being of the detainees, which includes protection from self-harm.  A facility cannot stand by and fail to intervene in self-injurious behavior that is completely antithetical to our mission of maintaining the health and safety of noncitizens under our care.

b.  Moreover, other detainees may engage in hunger strikes, whether or not with the intention of committing suicide by starving themselves to death.  For a detainee to cause his own death without staff intervention would completely undermine DHS's obligation to render appropriate medical care and prevent detainee suicides.

c.  In addition to critical personal health and safety for each individual, general security and order in the facility can also be destabilized by hunger strikes, which risks harm to other persons in the facility, including detainees, staff, contractors, volunteers, and visitors.  Perceptions may be formed by the ICE detained population that ICE will simply let a detainee die, without intervening to save him or her, which could lead to lowered morale, resentment, acts of detainee violence and disruptions.  The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the facility.  I am concerned that hunger strikes, and even other acts of a disruptive or violent nature, would be directed at staff and other providers, to express detainee anger, resentment, and frustration.

d.  If such disruptive acts were to occur, tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

e.  Other detainees may decide that they have lost confidence in the skills, ability, or willingness of medical staff at the facility to administer medical care.  They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff.  They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

f.  Detainees who participate in hunger strikes may severely and permanently damage their health.  This may also require immediate and long-term medical care which in turn may

3

require DHS to unnecessarily divert and expend its limited resources when such action can be avoided with appropriate medical intervention.

g. In the absence of an adequate response to life-threatening hunger strikes, other detainees may participate in such activities in an attempt to change facility operations or exact concessions from facility management, rather than using other available means that do not threaten their health and wellbeing.  For example, Detainees may initiate hunger strikes to pressure staff to transfer them away from the facility, or to gain their release from detention.  Without the ability to intervene when medically necessary, the facility will be forced to choose between letting the detainee die and giving in to their demands.  ICE supports detainees' ability to express concerns about their cases, and an array of options – short of life-threatening hunger strikes – is available to them, including:

   i. Pursuit of applications for relief and protection from removal in proceedings before a neutral immigration judge;
   ii. Submission of facility-specific informal and formal grievances (including emergency grievance processes and appeal processes) relating to any aspect of their detention, including medical care, which trigger prompt responses;
   iii. Submission of the online ERO Contact Form on the detainees' behalf by stakeholders, including interested individuals, nongovernmental organizations, faith-based organizations, and advocacy groups;[1]
   iv. Complaints to oversight entities within DHS, including the Office of Inspector General, Office for Civil Rights and Civil Liberties, Office of Detention Ombudsman, as well as the ICE Office of Professional Responsibility; and
   v. Use of the Detention Reporting and Information Line, a toll-free service that provides a direct channel for detainees, family members, private attorneys, and other stakeholders to communicate directly with ICE ERO about detainee allegations and concerns.

h. Some detainees may merely voice threats to go on a hunger strike, diverting additional staff attention away from other detainees.

i. If a detainee is permitted to die from self-starvation, public perception of DHS and its staff will be adversely affected.  Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

9.    For the reasons stated above, to allow Asadieidivand to continue to refuse to eat would

harm ICE's ability to protect detainees from self-harm and suicide, and operate the FDC in a

---

[1] This form is available at: https://www.ice.gov/webform/ero-contact-form.

4

safe, secure and orderly manner and it will be necessary to involuntarily administer nutrients

and/or fluids to him, to prevent imminent bodily harm and/or death.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed June 10, 2025

CESAR A TOPETE

Digitally signed by
CESAR A TOPETE
Date: 2025.06.10
12:15:53 -07'00'

Cesar A. Topete
Assistant Field Office Director
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Florence Detention Center

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

UNITED STATES OF AMERICA

                                        Case No.

                    Plaintiff,

     v.

Mehrad Asadiedidivand

                    Defendant

**DECLARATION OF CARLOS QUINONES, MD**

I, Carlos Quinones, MD, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1.     I am a licensed, Board-Certified Family Medicine physician currently serving as the Clinical Director at the Florence Service Processing Center (FLO) under the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC), a position I have held since October 2023. I have been with this agency since 2005, previously serving as Clinical Director at other facilities. In this role, I have overseen the delivery of comprehensive medical, mental health, and behavioral health services, ensured compliance with clinical and regulatory standards, supervised multidisciplinary clinical staff, and led quality assurance and evidence-based care initiatives.

2.     ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody.  The health, safety, and welfare of those detained in its custody are among

Page 1 of 7

agency's highest priorities, and IHSC has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

3.     As the Physician at the Florence Processing Center, my duties include providing medical care for detainees at the facility.

4.     This declaration is made in support of the Complaint and Motion by the United States of America to perform involuntary vital measurements, examination, intravenous hydration, and involuntary feedings for Asadiedidivand, Mehrad A# XXX-XXX-606 who is detained at Florence Processing Center.

5.     I am the treating physician of Asadiedidivand, Mehrad, and I make this declaration upon a review of their medical record and my examination and treatment of Asadiedidivand, Mehrad.

6.     Asadiedidivand, Mehrad is a native and citizen of Iran.  He was transferred from another ICE detention facility to the Florence Processing Center on May 31, 2025.  His official hunger strike began on June 8, 2025, while in custody at this facility.  As of now, he has missed 14 meals and is resusing both oral (PO) and intravenous (IV fluids).

7.     Asadiedidivand, Mehrad has stated that he is participating in a hunger strike in response to perceived injustices committed against him.   As of today, he is on day three of the hunger strike and has missed 14 meals including breakfast.  He has not consumed any food and has had minimal daily water intake since initiating the strike.

8.     Asadiedidivand, Mehrad's weight on May 31,2025, was recorded at 209 pounds. His weight immediately prior to declaring the hunger strike was 210 pounds.   His current weight is 195.6 pounds, reflecting a total loss of 14.6 pounds, or approximately 6.86% of his baseline body weight.  He is now refusing further weight checks.

9.     Asadiedidivand, Mehrad has been evaluated by a licensed clinical psychologist. The evaluation found no evidence of a psychiatric condition that would impair his ability to make informed decisions regarding food or fluid intake. He appears to be acting voluntarily and with full cognitive awareness.

10.     Asadiedidivand, Mehrad is fluent in the English language and has been counseled by medical staff regarding the physiological effects of self-imposed dehydration and starvation. He has also been informed of the potential need for involuntary hydration and nutritional support, including the procedures that may be implemented to prevent serious injury or death should he continue to refuse food and fluids.

11.     Asadiedidivand, Mehrad's condition has shown signs of rapid decompensation. On June 8, 2025, he was transported to the emergency room due to dizziness and generalized weakness. Laboratory results at that time indicated acute kidney injury, with a BUN of 27, creatinine of 1.59, and an eGFR of 56. Despite being counseled by emergency room physicians on the risks of muscle breakdown and the potential for rhabdomyolysis leading to kidney failure and death, he refused all hydration and treatment. He is now slow to respond, exhibits pallor upon sitting, and reports palpitations, dizziness, and nausea. He demonstrates decreased strength throughout, an unsteady gait, and has ceased producing urine. He is also refusing to stand, and continues to decline orthostatic blood pressure measurements, full physical assessments, EKG, laboratory testing, and any further hospital transfer.

12.     As of June 10, 2025, we are requesting authorization to initiate involuntary intravenous (IV) fluid resuscitation, laboratory testing—including prealbumin and kidney function panels—and the collection of vital signs. The patient is currently refusing all vital sign assessments, clinical examinations, and essential laboratory monitoring, including blood and urine

samples. He continues to decline both oral (PO) and IV hydration, nutritional supplements (Boost), and food intake.

13.    He remains in custody at the Florence Processing Center and is currently under continuous medical observation by Dr. Carlos Quinones.

14.    Up until June 9, 2025, Asadiedidivand, Mehrad cooperated with medical staff in allowing the collection of vital signs and the performance of basic physical examinations. However, as of June 10, 2025, he has begun refusing to allow medical staff to perform vital sign assessments, physical examinations, and routine laboratory testing.

15.    Laboratory tests are necessary to evaluate the metabolic state, including electrolyte levels and kidney function

16.    The laboratory tests that need to be obtain during a hunger strike include:

    a.    Complete metabolic panel.  This test reveals an increase in markers of kidney function in view of any renal injury.  The panel tests BUN (blood urea nitrogen) creatinine level and proteins.  It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels.

    b.    Complete blood count.  This test reveals the hemoglobin level.

    c.    Urinalysis, which reveals the presence of ketones, blood and crystals in the urine.

    d.    Thiamine levels to assess deficiency at day 14 of a hunger strike.

    e.    Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

    f.    Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle  cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle tissue that can fatally damage other vital organs.

    g.    Prealbumin, used as a marker for nutritional status evaluation.  Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk.  Normal prealbumin is 15-35 mg/dL.  When prealbumin falls

to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

17.     The duration a human body can survive without food varies and is influenced by factors such as baseline nutritional status and fat reserves. Individuals with limited fat stores are at greater risk of rapid deterioration. Without water, survival is typically limited to approximately eight to ten days, after which severe complications—such as delirium, seizures, and unconsciousness—may occur. Dehydration significantly accelerates the effects of starvation by impairing the body's ability to eliminate waste. Death from terminal total fasting often results from acute thiamine depletion, which can lead to fatal arrhythmias and/or cardiac arrest.r cardiac arrest.

18.     Asadiedidivand, Mehrad's condition is expected to continue deteriorating as his hunger strike progresses. This assessment is based on his current physical symptoms, including cognitive changes and diminished ability to perform activities of daily living (ADLs), his ongoing inability to produce adequate urine output, and laboratory findings obtained from the emergency room on June 8, 2025. He is experiencing a rapid decline accompanied by worsening neurological symptoms, which are severe enough to warrant hospitalization. As noted in paragraph 11, he has already suffered adverse effects as a result of prolonged refusal to ingest nutrients.

19.     According to medical literature, metabolic imbalance resulting from prolonged fasting can lead to permanent bodily harm and/or death. This risk becomes significantly elevated when an individual experiences a weight loss of approximately 18% or more of their initial body weight.

20.     Medical staff have explained to Asadiedidivand, Mehrad the necessity of nutritional intake to preserve his health, as well as the medical risks associated with continuing his hunger strike. Other staff members have made repeated efforts to encourage him to consume solid foods, liquid or bland diets, and nutritional supplements. Despite these efforts, Asadiedidivand,

Mehrad has consistently refused to eat solid food, drink water, or accept nutritional supplementation diets, and/or drink nutritional supplements.

21.    I have personally discussed with Asadiedidivand, Mehrad my concerns regarding his medical condition and the serious risks associated with continued lack of nourishment. I explained that he is at risk of significant and progressive metabolic disturbances resulting from inadequate nutritional intake. If he continues his hunger strike, he is likely to develop severe metabolic imbalance, which carries a high risk of permanent damage to vital organs such as the kidneys and liver, potential heart failure, and ultimately, death. Despite this counseling, Asadiedidivand, Mehrad stated that he intends to continue his hunger strike.

22.    In my professional medical judgment, if Asadiedidivand, Mehrad continues his hunger strike—compounded by inadequate oral hydration—he will soon require immediate medical intervention to prevent further deterioration and serious medical complications. Prolonged fasting will result in irreversible damage to internal organs and poses a life-threatening risk. If left untreated, metabolic imbalance may lead to fatal arrhythmias and/or cardiac arrest.

23.    Should medical intervention become necessary, it will be required to administer nutritional support to Asadiedidivand, Mehrad via a nasogastric tube and/or intravenous line to ensure adequate caloric and nutrient intake. Due to his current state of dehydration, intravenous fluid hydration may also be necessary to stabilize his blood pressure and alleviate symptoms associated with postural hypotension.

24.    It is also necessary to conduct laboratory testing and physical evaluations to monitor and assess Asadiedidivand, Mehrad's clinical condition. Should the laboratory results indicate additional medical concerns, it may be necessary to administer appropriate medications intravenously to address those conditions.

25.     Based on Asadiedidivand, Mehrad's current physical condition, and the fact that he has not received adequate nutrition or appropriate oral fluid intake, it is my informed medical opinion—within a reasonable degree of medical certainty—that ongoing involuntary intravenous hydration and nutritional support are medically necessary at this time. His voluntary refusal of food and fluids significantly increases the risk of rapid clinical deterioration. Involuntary hydration and feeding would be implemented only as necessary to prevent injury, further dehydration, malnutrition, organ failure, or death resulting from his self-imposed hunger strike. Nutritional support would be administered via nasogastric tube or intravenous (parenteral) means.

26.     The issuance of a court order authorizing involuntary feedings, hydration, blood draws, and all necessary physical examinations is medically necessary to preserve and sustain Asadiedidivand, Mehrad's health, safety and life.

27.      To ensure the patient's health, welfare, medical safety, and preservation of life, the use of medical soft restraints may be required. Should the patient refuse to cooperate with laboratory blood draws, involuntary hydration, or involuntary nutrition, restraints would be used solely to immobilize the patient and prevent unnecessary harm to both the patient and medical staff during the administration of essential medical care.

I declare under penalty of perjury that the foregoing is true and correct.


Executed June 10, 2025

CARLOS M QUINONES ORTIZ

Digitally signed by CARLOS M QUINONES ORTIZ
Date: 2025.06.10 16:01:46 -07'00'

**Carlos, Quinones, MD**
Clinical Director,
Florence Processing Center